IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

                                     **REPORT AND**
                                     **RECOMMENDATION**

v.

                                     10-CR-360(A)

TERRY STEWART,

                 Defendant.

_____

        Defendant is charged in a Second Superseding Indictment [208][1] with, *inter alia*, racketeering, conspiracy, and transportation of stolen merchandise in interstate and foreign commerce. This case has been referred to me by Hon. Richard J. Arcara for supervision of all pretrial proceedings.

        Before me is defendant's motion to suppress statements dated October 14 and 22, 2010, along with physical evidence [118]. An evidentiary hearing was held on October 19, 20 and 31, 2011 [203, 202, 201], followed by the parties' post-hearing submissions [219, 242]. Oral argument was held on September 27, 2012 [290]. For the following reasons, I recommend that the motion be denied.

**HEARING TESTIMONY**

        <u>New York State Police Investigator James Thompson</u> - Investigator Thompson testified that he took a statement from defendant on October 14, 2010 at the New York state Police substation in Chili, New York (October 19, 2011 hearing transcript [203], pp. 9, 12). Exhibit S2 [164-1] is his handwritten notes of the interview, and exhibit S3 [164-2] is the

---

[1]     Bracketed references are to CM-ECF docket entries.

typewritten statement signed by defendant (id., pp. 9-10). He was introduced to Stewart by Investigator Landahl and told to conduct an interview (id., p. 14). He took Stewart to a sergeant's office and they sat down at a desk (id., p. 15). He started with pedigree information at 2:10 p.m. (id., p. 18), and administered Miranda warnings at 3:46 p.m. by reading them from a card (id., p. 18; exs. S1, S2). Stewart indicated that he understood the warning and would speak, responding "yes, I suppose, yup that's fine" (id., pp. 21-22; ex.S2).

Thompson initially spoke to Stewart, followed by Investigator Landahl. Thompson then returned and took a written statement from Stewart (id., p. 22). Stewart appeared to understand and answer appropriately (id., p. 23). No threats or promises were made to Stewart, and he never asked for lawyer or to stop the questioning (id., pp. 24-25). He took several breaks during this time (id.). Co-defendant Arlene Combs, his ex-girlfriend, was in separate room being interviewed. Thompson checked periodically to see what information she was giving, because he thought Stewart was not telling the truth (id., pp. 25-26). Stewart asked to speak with Combs, and met with her in the garage. He was not under arrest at the time (id., pp. 27, 28).

Investigator Landahl then took over questioning Stewart for 60-90 minutes. He then told Thompson that Stewart was providing accurate information, and that he should take a written statement (id., p. 31; ex. S3). Thompson pulled up the statement form on the computer, and the Miranda warnings automatically appeared on the form. Thompson again read the Miranda warnings from the computer to Stewart, who initialed the warnings (id., p. 33; ex. S3). Stewart did not ask for an attorney or say he did not want to speak (id.). Thompson typed the form as he was speaking to Stewart (id., p. 34). It took approximately 90 minutes to prepare (id., p. 36). Stewart signed each page of the statement, and the last page he signed, dated and put the

time, 9:23 p.m. (id., pp. 38-39). During the time the statement was prepared, Stewart took several bathroom and smoke breaks (id., p. 41). Thompson told Stewart from the outset that he was not under arrest and was free to leave at any time (id., p. 98).

Thompson offered Stewart food and drink a couple times, but he refused, saying that his stomach was upset (id., p. 46). However, he drank a friend's Pepsi during a bathroom break (id., p. 47). Thompson never heard Landahl state that Stewart or Combs would not be charged (id., p. 49). There was very little correlation between the information in his handwritten notes (ex. S2) and the typewritten statement (ex. S3) because the original information he provided, reflected in his handwritten notes, was not accurate (id., p. 110).

New York State Police Investigator Richard Landahl - Landahl testified that Stewart told him that his brother drove him to the Chili police station (id., p. 121). Landahl assigned Thompson to interview Stewart while Landahl checked in on the interviews of the others (id., p. 122). When Thompson told him that Stewart was denying any involvement in the burglary of the Marciniak home, Landahl told Stewart that the other, including Combs, were cooperating. Stewart didn't believe him, and asked to speak to Combs. They spoke in private for approximately 15 minutes (id., pp. 124-25).

When he first met Stewart he Mirandized him from card similar to S1, but did not re-Mirandize him after Stewart spoke with Combs (id., pp. 125-26). He told Stewart that he didn't believe his denial of knowledge, and that others were cooperating (id., p. 127). Landahl then spent an hour or so with Stewart, and obtained information that implicated him, whereupon he turned him back over to Thompson and told him to take a written statement (id., pp. 128-29). Stewart told Landahl that he got some belt buckles from the robbery and they were at his home in

-3-

Springwater. He agreed to give them to Landahl if Combs could accompany them (id., pp. 130-31).

After Stewart's statement was taken, Thompson, Landahl, Combs and Stewart drove to his home in Springwater, where Stewart retrieved a plastic bag with belt buckles and gave them to Landahl (id., pp. 132-34).

Landahl stated that no threats or promises were made to Stewart (id., pp. 134-35). He denied telling Stewart's mother that he would not be prosecuted (id., p. 135), but admitted telling Stewart, in response to his question, that they would not be charged that evening (id., p. 140). He stated that Stewart was not under arrest that day, nor was he handcuffed or restrained in any way (id., p. 138). However, he admitted that "nobody who is not a state police member is allowed to walk around without the escort of a state police member" (id., p. 139). He denied that Stewart ever asked for a lawyer (id..).

Although he denied calling District Attorney Joseph Cardone in Stewart's presence (id., p. 142), he apparently told the grand jury that he may have extended his cell phone to Stewart with Cardone on the line (id., p. 154). He admitted that Stewart had asked during that day whether he would be charged, and said that he could not give him an answer (id., p. 163). He told him that would be up to the District Attorney (id., p. 165). When asked whether he told Stewart's mother that he would not be charged, Landahl responded "I don't recall" (id., p. 183).

Subsequently it was decided that DA Cardone would contact federal authorities and a further interview of Stewart and Combs would be scheduled (id., p. 191). It took several days for them to return his phone calls (id., p. 194). He arranged a meeting at the Chili barracks on October 22, 2010.

FBI Special Agent Michael McElhenny - SA McElhenny interviewed Stewart at the Chili State Police barracks on October 22, 2010 (id., p. 217). He first interviewed Combs (218). His interview with Stewart began at 8 or 8:30 pm.(id., p. 218). At the outset, he presented Stewart with an "Advice of Rights" form (ex. S5 [164-4]) which Stewart read and signed (id., pp. 219-22). Stewart said he understood his rights and was willing to speak (219-20). The interview lasted an hour or so (id., p. 222). Stewart appeared upset, concerned, and remorseful (id.). Exhibit S7 [164-6] is his notes of the interview and exhibit S6 [164-5] is the 302 report (id., pp. 223-24). No threats or promises were made, and Stewart never asked for a lawyer or to stop the interview (id., pp. 224-25). Stewart never said at that time that he had been promised anything (id., p. 226).

They met again on October 27, 2010. At that time, District Attorney Cardone was also present. Stewart was upset, claiming that he was in jail for something he did not do, and that he had a deal with the District Attorney's office. Cardone responded that there were never any deals or promises made, and Stewart did not reply (id., pp. 229-30).

Terry Stewart - Stewart testified that he was picked up by police at Combs' mother's house in Rochester at approximately 1:30 p.m. on October 14, 2010 and brought to the Chili police barracks in a police car (October 20, 2011 hearing transcript [202], pp. 27-32). Upon arrival at the barracks, he was escorted through a series of doors, which were operated by a key card, into the squad room (id., p. 34). He was then taken to a corner office where Investigator Thompson began to speak with him. He claimed that he refused and requested an attorney, to which Thompson replied that he was only entitled to an attorney if he was being charged, and that he was not being arrested (id., pp. 35-36). He testified that at no time did Thompson read

Miranda rights from a card, and that he said if he was not being arrested then he wanted to leave (id., p. 38). He stated that Thompson then left the room and returned shortly thereafter with Landahl, both of whom assured him that he was not going to be charged (id., p. 40). However, Thompson took his cell phone (id., p. 41).

He claimed that he repeatedly told them that he wanted to speak with an attorney and leave (id.). He finally agreed to speak to them "because I was made promises that me nor my girlfriend would be charged with anything, not only by the investigators, because I didn't feel that was good enough, but also by the DA Cardone" (id., p. 42). He said that Landahl called Cardone and held his cell phone out, and he heard a male voice on the line "saying they're not interested in me or my girlfriend. They're only interested in Rico Vendetti" (id., pp. 42-43). He took that to mean that they would not be charged (id., p. 43). However, he later admitted that that statement did not mean that he would not be prosecuted (id., p. 109), that at no time on the 14th did Cardone tell him he would not be charged (id., p. 103), and that he did not feel that he was "free and clear" based upon what Cardone had said (id., p. 108). In any event, he claims to have told Landahl "that just because somebody on the phone says that I'm not going to be charged, that doesn't really guarantee me anything" (id., pp. 93-94). He admitted that at his request, he was allowed to speak with Combs in the garage of the barracks (id., pp. 44-45).

He claimed that Thompson did not advise him of his Miranda rights until after the statement (exhibit S3) was printed off the computer, and he signed the statement because he was given guarantees that they would not be charged (id., p. 49). After they drove to his home in Springwater to get the belt buckles, they returned to the police barracks where he was given a

receipt for the property and his cell phone was returned. Then his brother John and a friend drove him and Combs back home to Springwater (id., p. 51).

Thereafter Landahl repeatedly attempted to contact him - "he probably called 50 times" (id., p. 53). Stewart ignored his calls because "I didn't feel I had anything more to say to him" (id., p. 54). He admitted that he was "ducking the investigator who needed [his] help" (id., pp. 133-34). Landahl then contacted Stewart's mother who told him that the police wanted to speak to him again - "they just wanted more information on Vendetti" (id., p. 55). On October 22, 2010 his mother drove him and Combs to the State Police barracks in Chili. Landahl and Thompson met him there and took him to the same room where he had previously been interviewed (id.). This was after 8:00 p.m. (id., p. 56). He claimed that Landahl said they were waiting for another party to arrive, that nothing had changed and that they still were not being charged (id., p. 57).

After SA McElhenny arrived they went upstairs to a larger room. McElhenny introduced himself and showed Stewart his badge. He said he wanted information on Vendetti. Stewart claimed he "was scared bringing in the FBI . . . I told him this is pretty serious. I think I need a lawyer" (id., p. 58). He stated that Landahl again told him "that I was not going to be charged at all, that they were just interested in Rico Vendetti" (id., p. 59). At that point he gave them incriminating information (id.). The meeting ended around midnight, whereupon he was arrested and driven to the Orleans County jail (id., p. 60). Attorney Michael O'Keefe was assigned to represent him (id., p. 61).

Mary Stewart - Stewart's mother testified that on the evening of October 14, 2010 Landahl told her that "Terry and Arlene were not going to be charged with anything. They were assisting him in an investigation concerning Rico Vendetti" (id., p. 213).

John Stewart - John Stewart is defendant's brother. At approximately 1:00 p.m. on October 14, 2010 he was at 214 Glenwood Avenue in Rochester when five or six police cars arrived. Officers put defendant into one of the cars and drove off (id., pp. 226-27). He and a friend then drove to the state police barracks, where he was told that defendant would be there awhile (id., p. 229). He returned to the barracks at 1:00 a.m. on October 15, where he picked up Stewart and Combs (id., pp. 229-30). He stated that at that time Stewart was concerned that Combs was going to be charged (id., p. 232).

DA Joseph Cardone - DA Cardone testified that Landahl called him on October 14, 2010 stating that Stewart was concerned about whether Combs would be taken into custody that evening, and that "based on their level of cooperation, he didn't feel it was going to be a problem if we didn't take them into custody", and that he agreed with Landahl that they could be released that evening (October 31, 2011 hearing transcript [201], p. 23). He denied telling Landahl that they were only interested in Vendetti, not Stewart (id., p. 22), or that Stewart would not be charged (id., p. 24). He further testified that at their meeting on October 27, 2010 Stewart complained that he thought they had a deal, and he "explained to him that we had no such deal" (id., p. 27).

**ANALYSIS**

Defendant Stewart "contends that his statements must be suppressed because: (1) the *Miranda* warnings given by Thompson on October 14, 2010 were constitutionally deficient, having been given after questioning was well under way; (2) he was improperly coerced into waiving his rights on October 14, and 22, 2010 by promises that he and his girlfriend [Arlene Combs] would not be prosecuted; and (3) he was improperly denied his constitutional right to counsel." Defendant's Post-Hearing Memorandum of Law [242], p. 9. He also argues that the belt buckles which he turned over to police should be suppressed because he had been assured that that he would not be prosecuted. Id., p. 16, n. 3.

Each of these arguments will be addressed:

**A.     October 14 Miranda Warnings**

Stewart does not deny that he was given Miranda warnings on October 14, 2010 - rather, he argues that they were not given at a meaningful time. However, since "Miranda's warning requirements apply only to custodial interrogation", United States v. Newton, 369 F.3d 659, 669 (2d Cir.), cert. denied, 543 U.S. 947 (2004), I must first decide whether he was in custody on that date - for if he was not, then no warnings were necessary.

The fact that Miranda warnings were given "do[es] not, in and of itself, create custodial interrogation, but [is] just one factor to consider". Mastowski v. Superintendent, 2011WL 4955029, *10 (W.D.N.Y. 2011) (Telesca, J.).  "[A] noncustodial situation is not converted to one in which Miranda applies simply because . . . the questioning took place in a coercive environment . . . . Nor is the requirement of warnings to be imposed simply because the

questioning takes place in the station house, or because the questioned person is one whom the police suspect." Oregon v. Mathiason, 429 U.S. 492, 495 (1977).

Instead, an interrogation is deemed "custodial" only where "a reasonable person would not have thought himself free to leave" *and* "in addition to not feeling free to leave, a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest". Newton, 369 F.3d at 672. "Only if the answer to this second question is yes was the person in custody . . . and entitled to the full panoply of protections prescribed by Miranda". Id.

Although I find that a reasonable person in Stewart's position might not have felt himself free to leave the barracks, I further find that a reasonable person in his position would *not* have "understood his freedom of action to have been continual curtailed to a degree associated with a formal arrest". Stewart admitted that he was repeatedly assured that he was not under arrest, and was not handcuffed. *See* United States v. Mitchell, 2012 WL 6827387, *10 (W.D.N.Y. 2012) (Feldman, M.J.), adopted, 2013 WL 132459 (W.D.N.Y. 2013) (Larimer, J.) (*quoting* United States v. Newton, 369 F.3d 659, 676 (2d Cir. 2004), cert. denied, 543 U.S. 947 (2004)) ("Mitchell was never handcuffed, a form of restraint 'generally recognized as a hallmark of a formal arrest' . . . . Funderburk never advised Mitchell that he was under arrest or was going to be arrested"). Moreover, he was given several breaks, including the opportunity to speak with co-defendant Arlene Combs, an opportunity which would not have been offered to someone under arrest. Therefore, I conclude that Stewart was not in custody at the time of his questioning on October 14, 2010, and was not entitled to Miranda warnings.

In any event, I find that Miranda warnings were provided in a timely manner. Although Investigator Thompson's notes (S2) indicate that he began meeting with Stewart at 2:10 p.m. but did not provide Miranda warnings until 3:46 p.m., the notes further indicate that no incriminating statements were made prior to the warnings. Furthermore, I credit Investigator Landahl's testimony that he also gave Stewart Miranda warnings before Stewart met with Investigator Thompson.

**B.     Improper Coercion**

The credible evidence leads me to conclude that the only promise made to Stewart was that he and Arlene Combs would not be *arrested* on October 14, 2010 - not that they would never be charged. Investigators Thompson and Landahl, DA Cardone and SA McElhenny all testified that they made no such promises, and on cross-examination Stewart admitted that he did not think that he was "free and clear" based upon what DA Cardone had said. Moreover, Stewart's brother, John Stewart, testified that when he picked Stewart up at the barracks early on October 15, 2010, Stewart expressed concern that Combs was going to be charged.

In addition, the Miranda warning forms which Stewart signed on October 14 and October 22, 2010 (S3 [164-2]; S5 [164-4]) both expressly advised him of the possibility that his statements could be used against him in court. Finally - and perhaps of greatest significance - Stewart's behavior in ignoring Investigator Landahl's numerous telephone calls in the days following October 14, 2010 is hardly indicative of someone who believed that he had been promised immunity from prosecution in return for his cooperation.

Therefore, I conclude that Stewart was not improperly coerced into making statements or producing the belt buckles which he now seeks to suppress.

C.     **Denial of Right to Counsel**

"[T]he Fifth Amendment right to counsel applies when a defendant is subject to *custodial* interrogation". United States v. Medunjanin, 2012 WL 1514766, *7 (E.D.N.Y. 2012) (emphasis added). Therefore, unless defendant's statement was taken while he was in custody, I need not determine whether he requested counsel, because he had no such right. *See* United States v. Ellison, 632 F.3d 727, 730-31 (1st Cir.), cert. denied, 131 S.Ct. 295 (2010) ("Ellison also argues that the interrogation should have ceased once he invoked his right to counsel . . . . But even if Ellison had clearly expressed a desire to speak with a lawyer, he could not have invoked any constitutional right to do that in a non-custodial interrogation conducted before he was formally charged").

Since I have already concluded that Stewart was not in custody at the time of his questioning on October 14, 2010, he had no Fifth Amendment right to counsel. For the same reasons, I conclude that he was not in custody on October 22, 2010, and likewise had no Fifth Amendment right to counsel on that date.

In any event, I credit the testimony of Investigators Thompson and Landahl as well as SA McElhenny, all of whom stated that Stewart did not request an attorney on October 14 or 22, 2010.

## CONCLUSION

For these reasons, I recommend that the motion to suppress [118] be denied. Unless otherwise ordered by Judge Arcara, any objections to this Report and Recommendation must be filed with the clerk of this court by February 8, 2013 (applying the time frames set forth in Rules 45(a)(1)(C), 45(c), and 59(b)(2)). Any requests for extension of this deadline must be made to Judge Arcara. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objection.

DATED: January 22, 2013

                                    /s/ Jeremiah J. McCarthy
                                    JEREMIAH J. MCCARTHY
                                    United States Magistrate Judge